**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN GARCIA,
            *Plaintiff-Appellee,*

            v.

COUNTY OF MERCED; JOHN TAYLOR,
Merced County Deputy Sheriff,
            *Defendants-Appellants,*

            and

MERCED COUNTY SHERIFF'S
DEPARTMENT; MERCED COUNTY
DISTRICT ATTORNEY'S OFFICE;
GORDON SPENCER, District
Attorney; ALFREDO CARDWOOD,
Bureau of Narcotics Enforcement
Special Agent Supervisor,
            *Defendants.*

No. 09-17188

D.C. No.
1:07-cv-00867-
OWW-DLB

5983

JOHN GARCIA,

              *Plaintiff-Appellee,*

       v.

COUNTY OF MERCED; JOHN TAYLOR,
Merced County Deputy Sheriff;
MERCED COUNTY SHERIFF'S
DEPARTMENT; MERCED COUNTY
DISTRICT ATTORNEY'S OFFICE;
GORDON SPENCER, District
Attorney,

              *Defendants,*

      and

ALFREDO CARDWOOD, Bureau of
Narcotics Enforcement Special
Agent Supervisor,

           *Defendant-Appellant.*

No. 09-17189

D.C. No.
1:07-cv-00867-
OWW-DLB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
February 15, 2011—San Francisco, California

Filed May 5, 2011

Before: John T. Noonan, Diarmuid F. O'Scannlain, and
Stephen S. Trott, Circuit Judges.

Opinion by Judge Trott

## COUNSEL

Michael Woods, McCormick, Barstow, Sheppard, Wayte & Carruth LLP, Fresno, California; Roger Matzkind, Chief Civil Litigator, County of Merced, Merced, California, for the defendant-appellants.

John Garcia, Law Office of John Garcia, Merced, California; Norman Newhouse, Redwood City, California, for the plaintiff-appellee.

## OPINION

TROTT, Circuit Judge:

Defendants Alfredo Cardwood and John Taylor (the "Officers") interlocutorily appeal the district court's denial of qualified immunity from John Garcia's 42 U.S.C. § 1983 Fourth

Amendment claims against them. Garcia's Fourth Amendment claims and his state law false imprisonment claim arose out of his arrest on suspicion of smuggling methamphetamine into the Merced County Jail to one of his clients, Alfonso Robledo, and from a subsequent search, supported by a search warrant, of his office.[1] We reverse and remand for entry of judgment in favor of the Officers.

## A. Standard of Review

We review de novo a grant of summary judgment on the basis of qualified immunity. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). In determining whether summary judgment is appropriate, we must view the evidence in the light most favorable to the non-moving party. *Huppert v. City of Pittsburg*, 574 F.3d 696, 701 (9th Cir. 2009). "When a police officer asserts qualified immunity, we apply a two-part analysis . . . . " *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). The first question is whether "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second question is whether the right was "clearly established." *Id.* at 202. In determining whether a right was "clearly established," the court considers whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.*

Moreover, as the Supreme Court elaborated in *Anderson v. Creighton*, 483 U.S. 635 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials — like other officials who act in ways they reasonably believe to be lawful — should not be held personally liable." *Id.* at 641 (citing *Malley v. Briggs*, 475 U.S. 335, 344-345 (1986)). To subject such officials to the "fear of personal monetary liability and harassing litigation" carries with it the "substantial social costs" of

---

[1]Garcia was not prosecuted for the offense for which he was arrested.

unduly inhibiting them in the discharge of their official duties. *Anderson*, 483 U.S. at 638.

## B. Probable Cause to Arrest

[1] Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). For information to amount to probable cause, it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence, a distinction which the district court overlooked. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). As we said in *Lopez*, police are not required "to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence" that a suspect has committed a crime. *Id.* at 1078. All that is required is a "fair probability," given the totality of the evidence, that such is the case. *Id.* Considering the facts in the light most favorable to Garcia, we conclude that Officers Cardwood and Taylor reasonably concluded that there existed sufficient probable cause to arrest Garcia.

## C. The Investigation

Robert Plunkett, a jailhouse informant incarcerated on charges of theft, described in detail to law enforcement an elaborate method of smuggling methamphetamine into the Merced County Jail. According to the informant, one of his fellow inmates, Alfonso Robledo, told him he had an attorney, identified as Garcia, who was prepared to accept drugs from the informant for delivery to Robledo in jail. The drugs were to be concealed in a Bugler tobacco pouch.

Before acting on Plunkett's information, the Officers took steps to corroborate and to verify what he had told them. Dur-

ing this process, they confirmed from jail records and elsewhere the following:

> 1) Plunkett indeed had an in-custody relationship with Robledo.

> 2) Robledo was in jail on drug charges.

> 3) Garcia was Robledo's attorney.

> 4) Garcia's investigator, Augie Provencio,[2] had in fact been in the jail on business during the time of the discussions under investigation, as claimed by Plunkett.

> 5) Plunkett was not in a computer database of unreliable informants.

In addition, Plunkett named a "Sylvia Brown" as Garcia's usual source of methamphetamine, information he had received from Robledo. At Officer Taylor's request, Plunkett called Sylvia Brown on the telephone and told her he had gotten some drugs for Robledo, half of which were for Garcia, and the other half he would keep for himself. Sylvia Brown's response was to the effect that this arrangement was alright. Officer Taylor personally monitored the call.

Every fact and detail given by Plunkett checked out, and no misinformation or deception was discovered. As observed by the district court:

> [A]s [to] the reliability of Mr. Plunkett, the court is well satisfied that there were at least seven to eight items of corroboration that confirm what his report

---

[2]Provencio, according to the record, flushed the methamphetamine down the toilet in Garcia's office before the Officers arrived with a warrant.

was of the modus operandi, the people who were involved in it, how it was being conducted, and again, some of the circumstances of this case provide additional objective corroboration.

The district court's Memorandum Decision regarding the County Defendants' Motion for Summary Judgment or Partial Adjudication, dated September 28, 2008, states on page 5 as an undisputed fact, "SUF 20," that prior to Garcia's arrest, "Deputy Taylor also checked John Garcia's criminal record [before conducting the reverse sting], confirming that Garcia had a history of drug-related violations." The record does not support this statement. Although it is undisputed that Garcia served two prison terms in the 1960s and 1970s for drug-related offenses, one federal and one state, Garcia does dispute whether Deputy Taylor — or anybody else — examined his record before the search of Garcia's office. Taylor filed a declaration saying he did so check, but in his affidavit for the search warrant, he averred that Garcia's record was not available. Consequently, we decline the Officers' request to include Garcia's criminal record in our probable cause analysis.

Accordingly, after approval from the District Attorney's office, the Officers gave the informant (with permission from a judge) a Bugler tobacco pouch containing methamphetamine for delivery to Robledo via Garcia in what is called a "reverse sting." The methamphetamine was clearly visible to anyone opening the pouch. In surveillance mode, the Officers then saw Garcia accept the pouch from the informant and take it to his law office, which was later searched with a warrant supervised by a special master, as contemplated by Section 1524(c)(1) of the California Penal Code. The warrant was signed by the same judge who approved the release of the methamphetamine from official custody for the controlled delivery.

In these circumstances, whether Garcia opened the pouch when he received it from Plunkett or not, there can be no

doubt that Garcia's acceptance of the Bugler tobacco pouch from a person known to him to be a fellow inmate of his client, to be delivered to that client in jail, served unmistakably, without any more, as adequate confirmation and corroboration of the informant's detailed information.

[2] Facts require context. Garcia was neither a green attorney nor one familiar only with civil practice. As of his arrest, he had been practicing criminal law in Merced and Modesto for twenty years, a fact known to the Officers. Garcia does not dispute that he knew — as does anyone familiar with the system — that it was unlawful to deliver even tobacco to an inmate in the jail where Robledo and Plunkett were housed. Simply to accept jail contraband from one inmate who was out on a pass for delivery to another in custody raises unmistakable red flags. Thus, at the point of acceptance of the pouch, the Officers clearly had probable cause both to arrest Garcia and to support their application to Judge Dougherty for a search warrant for Garcia's office.[3] The probable cause we conclude was present was not just that Garcia knowingly possessed the methamphetamine in the prepared pouch, but that he was actively involved in smuggling a controlled substance and contraband into the jail.

[3] Granted, Robert Plunkett was a "jailhouse informant." However, the law does not exclude from consideration information from this source in connection with the workings of the criminal justice system, even as sworn witnesses in court. As the Supreme Court said in *On Lee v. United States*, 343 U.S. 747 (1952), "[s]ociety can ill afford to throw away the evidence produced by the falling out, jealousies, and quarrels

---

[3]The search produced from the bathroom a plastic bag containing a small amount of methamphetamine, a small amount of methamphetamine from the office, a one-pound scale, and six packages of Bugler tobacco. Garcia's explanation of the methamphetamine in the bathroom was the result of "spillage" when Augie Provencio flushed the contraband from the prepared Bugler package down the toilet.

of those who live by outwitting the law. Certainly no one would foreclose the turning of state's evidence by denizens of the underworld." *Id.* at 756. As Clarence M. Kelley, a former director of the Federal Bureau of Investigation once candidly observed, "without informants, we're nothing." In fact, our federal immunity statutes, 18 U.S.C. §§ 6002-6003, "reflect[ ] the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime." *Kastigar v. United States*, 406 U.S. 441, 446 (1972). Indeed, it was information from a jailhouse informant, Virginia Graham, that put an end to the murderous rampage of the vile Manson family, a cabal of killers that terrorized Los Angeles, California in 1969. While Graham was housed in the Sybil Brand Institute for Women with Susan Atkins, a member of "Charlie's Family," Atkins told Graham how she had killed the actress Sharon Tate. Graham passed this information to the authorities, and the rest is history. Thus, the relevant question regarding information from Plunkett — and from all jailhouse informants — is not whether it is legally cognizable, but whether it is corroborated and credible.

**[4]** Moreover, at the time of Garcia's arrest, Officers Cardwood and Taylor reasonably relied on the observation of Agent Carlisle, another member of the surveillance team, that Garcia opened the Bugler tobacco pouch in Plunkett's presence. When there has been communication among agents, probable cause can rest upon the investigating agents' "collective knowledge." *United States v. Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1980). An officer's statement that he witnessed a suspect knowingly take possession of a controlled substance establishes probable cause.

**[5]** In the alternative, we conclude that reasonable officers in possession of this information under these circumstances could not have known that to act as they did would violate the constitutional rights upon which Garcia predicates his consti-

tutional claims. *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000) (citing *Anderson*, 483 U.S. at 636-37).

**[6]** The mistake made by the district court in its analysis of probable cause was to use Garcia's *subsequent* self-serving denial that he *knowingly* accepted methamphetamine in the pouch as a reason, in a qualified immunity context, to conclude that probable cause *at the time of Garcia's arrest* was a disputed factual issue. For a trial on charges of knowing possession, Garcia might disclaim knowledge of the contents of the pouch, but that is a different issue from what the arresting officers had probable cause to believe when he was taken into custody. Probable cause cannot be defeated by a defendant's subsequent denial in court that he had the knowledge or the intent required for a conviction. Here, we note that Garcia does not dispute that he did carry the methamphetamine into his office.

**[7]** Accordingly, the Officers are plainly entitled to qualified immunity from Garcia's unlawful arrest claim.

## D.   Oral Affidavit for Search Warrant

**[8]** Probable cause to issue a search warrant exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The Fourth Amendment is violated when a facially valid search warrant contains "deliberate or reckless omissions of facts that tend to mislead." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). A plaintiff can survive summary judgment on a defendant's claim of qualified immunity only "if the plaintiff can *both* establish a substantial showing of a deliberate falsehood or reckless disregard *and* establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant." *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995) (second emphasis added).

Garcia's primary allegation is that by misrepresenting and/or omitting material information in the application for the search warrant about Plunkett's extensive criminal record, the Officers had engaged in actionable judicial deception. The omission Garcia characterizes as a "deliberate falsehood or reckless disregard for the truth" was the failure to flesh out Plunkett's status as a multiple felony offender — a *potential* "three striker."

**[9]** In the first place, there is no evidence — as acknowledged by the district court — that Cardwood was aware of Plunkett's record other than the fact that Plunkett was in jail for theft, a fact which the Officers did provide to the judge. In the second, it has long been clear beyond doubt to anyone in the criminal justice system that the word of a jailhouse informant alone — any jailhouse informant — is suspect and ordinarily requires corroboration before it can be accepted as probable cause. *Banks v. Dretke*, 540 U.S. 668, 701 (2004) ("This Court has long recognized the 'serious questions of credibility' informers pose."). Jailhouse informants can *always* be presumed to be looking for consideration in return for their information. The precise details of an informant's problems with the law, however, are not normally necessary to alert a judge to this glaring and well-known fact, especially in the case of an informant who was in jail on theft charges. Theft, the crime for which Plunkett was in jail, is a quintessential crime of dishonesty and moral turpitude. This fact, plus Plunkett's status, was sufficient to alert the judge to his suspect and shaky character.

Also, a judge evaluating a request for a search warrant is not a potted plant. The judge was free to ask questions, and had he wanted to know more about Plunkett, he was free to inquire, as judges most frequently do. This process is not a one way street. *See United States v. Leon*, 468 U.S. 897, 916 n.14 (1984) ("Although there are assertions that some magistrates become rubber stamps for the police and others may be unable effectively to screen police conduct, . . . we are not

convinced that this is a problem of major proportions."). Had the judge inquired about Plunkett's record and been told he had none, this would be a different case, but here, nothing of the sort happened. Calling this alleged omission regarding Plunkett's criminal record and possible expectations in return for his information a "falsehood" or anything of the sort is simply exaggerated rhetoric.

Moreover, examining the Officers' application leaves us with the firm belief that the search warrant still would have issued on the basis of the information presented to Judge Dougherty even if it had contained the "omissions" about which Garcia complains, as well as the details of Plunkett's prior convictions, which were mostly for drug offenses. All Plunkett's complete record could have done would be to confirm what Judge Dougherty clearly knew: caveat emptor.

## E.   Summary

Alfredo Cardwood and John Taylor did not violate Garcia's constitutional rights. They carefully evaluated Plunkett's information, checked it against known facts, and then applied to a judge for permission to use a controlled substance in the continuation of their investigation. Even before conducting the reverse sting, the Officers consulted with two deputy district attorneys who approved of the procedure they planned to use. They did not take Garcia into custody on the informant's information alone, but waited to see what Plunkett's contact with Garcia would produce. After developing probable cause to arrest Garcia, they forthrightly applied to the same judge, acting as a neutral magistrate, for a search warrant. They executed the warrant under the supervision of a court-appointed master (selected from an approved California State Bar list) to ensure the integrity of Garcia's law office and his client's files.

[10] This is not a case of rogue officers disregarding the plaintiff's constitutional rights. The officers in this case did

not "knowingly violate the law," and they were not "plainly incompetent." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). Accordingly, they are plainly entitled to the "ample protection" afforded to them by the doctrine of qualified immunity. *Id.*

## F.   State Law False Imprisonment

[11] The district court's denial of the Officers' motion for summary judgment on Garcia's state law false imprisonment claim is appealable because resolution of the issues properly raised on interlocutory appeal necessarily resolves the state law issue. *Batzel v. Smith*, 333 F.3d 1018, 1023 (9th Cir. 2003). California state law prohibits civil liability for false arrest where an arresting officer had reasonable cause to believe the arrest was lawful. Cal. Penal Code § 847(b)(1). Because the Officers had probable cause to arrest Garcia, it was error to deny their motion for summary judgment on Garcia's state law false arrest claim.

**REVERSED and REMANDED** with instructions to enter judgment on behalf of the Defendants.