**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IRMA WOODWARD, a single woman, individually, as Statutory Wrongful Death trustee of Michael Duncklee and personal representative of Estate of Michael Duncklee, *Plaintiff-Appellee*, | No. 16-15784 <br><br> D.C. No. 4:15-cv-00077-RM |
| v. | OPINION |
| CITY OF TUCSON, a political subdivision of the state of Arizona; Robert Soeder, an individual; and Allan Meyer, an individual, *Defendants-Appellants*. | |

Appeal from the United States District Court
for the District of Arizona
Rosemary Marquez, District Judge, Presiding

Argued and Submitted July 13, 2017
San Francisco, California

Filed September 15, 2017

Before:  Carlos T. Bea and N. Randy Smith, Circuit Judges,
        and Eduardo C. Robreno,[*] District Judge.

Opinion by Judge Robreno

---

**SUMMARY[**]**

---

**Qualified Immunity**

The panel reversed the district court's denial of qualified immunity to defendant Tucson police officers from plaintiff's claims under 42 U.S.C. § 1983 for unconstitutional seizures and use of excessive force.

Plaintiff's claims stemmed from the officers' warrantless entry into a vacant apartment and use of deadly force on Michael Duncklee, who aggressively attacked them while growling and brandishing a broken hockey stick inside the apartment.  Plaintiff is the representative of the Estate of Michael Duncklee.

The panel held that plaintiff had standing to assert Fourth Amendment violations as to Duncklee's seizure and the use of force against him.  The panel also held, however, that plaintiff lacked standing to assert a Fourth Amendment violation for the warrantless entry and seizure of the vacant apartment.  The panel held that the district court appeared to

---

[*] The Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

erroneously view the case through a landlord/tenant lens. Although plaintiff described Duncklee as an overnight guest of Amber Watts, the former tenant who was in the apartment with Duncklee, the panel held that Watts had no privacy rights to assign to Duncklee because she had been formally evicted and Watts was aware of this eviction.

Addressing qualified immunity regarding the seizure of the apartment, the panel held that because Duncklee had no reasonable expectation of privacy in the apartment, plaintiff could not establish that the officers violated Duncklee's Fourth Amendment rights by entering the apartment without a warrant. The panel concluded that the district court erred in denying qualified immunity regarding this claim.

Addressing qualified immunity regarding the seizure of and use of force on Duncklee, the panel held that reasonable officers in the defendant officers' positions would not have known that shooting Duncklee violated a clearly established right; and that the use of deadly force could be acceptable in such a situation. The panel concluded that the district court erred in denying defendants qualified immunity regarding this claim.

**COUNSEL**

Michael W.L. McCrory (argued), Principal Assistant City Attorney; Michael G. Rankin, City Attorney; City Attorney's Office, Tucson, Arizona; for Defendants-Appellants.

Matthew F. Schmidt (argued) and Ted A. Schmidt, Kinerk Schmidt & Sethi PLLC, Tucson, Arizona; Scott E. Boehm, Law Office of Scott E. Boehm PC, Phoenix, Arizona; for Plaintiff-Appellee.

**OPINION**

ROBRENO, District Judge:

This interlocutory appeal arises from the district court's denial of qualified immunity for Tucson police officers Allan Meyer and Robert Soeder ("Defendants") from Plaintiff's claims under 42 U.S.C. § 1983 for unconstitutional seizures and use of excessive force. The claims stem from the officers' warrantless entry into a vacant apartment and use of deadly force on Michael Duncklee, who aggressively attacked them while growling and brandishing a broken hockey stick inside the apartment.

Because the district court erroneously denied Defendants qualified immunity regarding both the warrantless entry into the apartment and the use of force on Duncklee, we reverse and remand.

## I.  FACTUAL AND PROCEDURAL HISTORY

As stated by the district court, "[t]his case presents an unusual circumstance in which the facts are largely

undisputed," and as acknowledged by Plaintiff, "[v]ery little is disputed, and certainly nothing that is significant." Answering Brief at 2 (ECF No. 21).[1] The district court summarized the facts of the case as follows:[2]

> At 8:58 p.m. on May 21, 2014, the Tucson Police Department ("TPD") received a call from "Zee." Zee reported she was employed by an apartment complex landlord, and former tenants were inside an apartment that was supposed to be empty. Zee stated she did not know how the tenants got inside. She also stated she was not on the scene and had learned of the former tenants' presence from a neighbor who called her, but did not want to leave their name.
>
> When the call was first received, the dispatch operator categorized it as a trespass with a priority level three. On a range of one to four, level one has the highest priority for

---

[1] At oral argument, upon questioning, Plaintiff's counsel similarly answered that the facts were "largely undisputed." Later, counsel did state that, "I believe the final confrontation – there are disputable facts about exactly what happened." However, counsel noted no factual disputes and subsequently acknowledged that there is no contradictory evidence in the record. Likewise, we have found no evidence that counters the statements of Defendants.

[2] The district court stated that the facts presented were those available to Soeder and Meyer at the time of their encounter with Duncklee, as those are the facts relevant to whether the seizures violated Duncklee's Fourth Amendment rights.

All footnotes in the quotation are original to it, but are renumbered for use in this opinion.

the most pressing situations, and level four has the lowest priority. At 9:20 p.m., the lead police officer in the area updated the call to note that it could be downgraded to a level four and placed on hold. The officer did so because the property was a vacant location, the person who witnessed the reported activity did not want to be a part of the investigation, there was no one on the scene to verify the allegations, and the owner was not on the scene.

Nearly two hours later, at 11:14 p.m., the operator dispatched the call. Officer Meyer responded and arrived at the apartment at 11:22 p.m. In his deposition, Officer Meyer testified that the metal security door was closed when he arrived. He turned the doorknob of the security door and learned that it was unlocked. He thereafter opened the security door, turned the doorknob of the front door and opened it enough to learn that it was also unlocked, and then closed the front door. Officer Meyer left the security door open. He then radioed for backup on the grounds that he had an apartment with an open door. Officer Soeder responded and arrived on the scene at 11:32 p.m. The officers both stated they did not see any sign of forced entry, although Officer Soeder noted that the security door was swung wide open when he arrived.

At this point, both officers drew their guns, knocked on the door, and announced

that they were police. When no one answered the officers' call, they opened the door and entered the apartment. They did not have a warrant. Upon entering the apartment, neither officer called for radio silence. Radio silence is requested when officers encounter a scene that they believe is likely to create an emergency such that they need the radio channels to be clear in case they need to radio for assistance.

Once in the apartment, the officers realized that space in the room was limited because there were numerous belongings stacked against the wall and taking up approximately half of the room. The officers cleared the front living room and determined that no one else was present. They saw a closed door to what is the apartment's only bedroom and could hear a radio playing inside the enclosed room.[3] The officers approached the closed door and arranged themselves such that Officer Soeder was to the left of the door and Officer Meyer was to the right. Officer Meyer then knocked on the door and announced their presence, at a volume he believed was loud enough to be heard over the radio playing in the room. No one responded.

---

[3] Officer Soeder testified in his deposition that he believed he could hear the music from outside the apartment. In his affidavit, he stated that they did not hear the "faint" radio until he was in the apartment.

Officer Soeder then opened the door. Because of his position he could not see into the bedroom. Officer Meyer, however, stated that he saw Mr. Duncklee holding "a large stick," with a woman behind him. Officer Meyer stated that Mr. Duncklee was holding the stick in a way that would allow him to strike at Officer Meyer's head. Officer Meyer stated the following in his affidavit:

> As soon as the door swung open enough to see Duncklee, he started charging[4] at me with the stick raised where it could strike at my head, chest or arms. As Duncklee charged he was also yelling something like "aaahh". [sic] From the instant I first saw Duncklee, I perceived that he was a serious and potentially deadly threat to me. He came at me in an aggressive manner with a scream and the stick raised over his shoulder. He was initially about five to six feet from me. Duncklee came

---

[4] Hours after the shooting, TPD officials interviewed both Officers Meyer and Soeder. Officer Meyer stated in his interview that Mr. Duncklee was approaching him "faster than a walk slower than a run a brisk um . . . uh a, hard to describe brisk walk um, not a run not a slow walk but he's advancing towards me um, I would say in an aggressive manner with a scream." (Doc. 33-1 at 201.)

through the door frame holding the stick in a swinging position with the end above his shoulder. I immediately started backing up, but knew that I couldn't back up very far because of the small size of the room and the clutter in it. I yelled "Police, stop" at Duncklee, Duncklee kept coming at me. I fired at Duncklee's chest.

Officer Soeder had a different perspective. He stated in his affidavit that when he first opened the door to the closed room,

I heard a growling noise as if it were an animal. Immediately after that, [Mr. Duncklee] burst through the door into the front room where we were. He was charging at me in a very aggressive manner holding a big, huge stick that appeared to be a hockey stick which he was starting to bring towards my head in a downward motion . . . . Duncklee had the hockey stick up and I remember seeing about 2 feet of the stick raised and coming down to hit my head. I heard a

gunshot. There wasn't room to back up because of the clutter and because Duncklee was charging so fast. I tried taking a step or two backwards and hit something behind me which made me start leaning backwards as I shot at Duncklee. I believe that my shot hit Duncklee's head because I was starting to lean backwards at that point from whatever was behind me. Duncklee was only about the distance I could reach if I stretched my arms straight out when I shot him. He was close enough at that point where he could hit me with the hockey stick.

Once shot, Mr. Duncklee fell to the floor and did not move. Officer Soeder believed that he had shot Mr. Duncklee in the head and Officer Meyer could see the head wound. The woman, Amber Watts, screamed and was subsequently ordered to come out of the room. When she responded that she could not because she had been shot, Officer Soeder went to her. He cleared the room and determined that no one was present. He then holstered his weapon and began applying first aid to her gunshot wounds.

Officer Meyer stayed in the front room with his gun drawn. He stated in his affidavit that he did not provide any assistance to Mr. Duncklee because he was not sure if Mr. Duncklee had any other weapons, and needed to be prepared in case someone else was in the apartment. In his deposition, Officer Meyer also stated that he did not have any first aid materials on him. Officer Meyer radioed that there had been a shooting and officers soon arrived on the scene. Officers thereafter relieved Officers Meyer and Soeder and sought a search warrant for the apartment.

Mr. Duncklee died from his gunshot wounds. Ms. Watts, who was shot twice in the leg, recovered. The stick Mr. Duncklee was holding was part of a hockey stick, measuring shortly over two feet.

Order, *Woodward v. City of Tucson*, No. 15-00077, at 2–5 (D. Ariz. Mar. 31, 2016) (alterations in original).

Duncklee's mother, Irma Woodward ("Plaintiff"), brought this action under 42 U.S.C. § 1983 against Officer Meyer, Officer Soeder, and the City of Tucson. In her amended complaint, Plaintiff alleged, *inter alia*, that Defendants violated the Fourth Amendment by unlawfully entering the apartment and using excessive force against Duncklee. Defendants asserted that they were entitled to qualified immunity. The parties filed cross-motions for summary judgment.

The district court denied Defendants' motion and granted Plaintiff's motion in part. First, the district court found that while Duncklee likely did not have standing to challenge the seizure of the apartment, he did have standing to challenge the seizure of his person and, thus, could "allege that Officers Meyer and Soeder violated [his] Fourth Amendment rights by entering the apartment."

Next, the court denied Defendants' motion for summary judgment, finding that Meyer and Soeder were not entitled to qualified immunity for either their warrantless seizure of the apartment or their use of force on Duncklee. As to the warrantless seizure claim, the district court concluded that Defendants' warrantless entry into the apartment violated the Fourth Amendment and that Defendants had failed to show the entry was reasonable in light of exigent circumstances or consent to enter. As a result, the court determined that Meyer and Soeder were not entitled to qualified immunity on this claim. The district court did not address whether Duncklee or Watts had standing to raise a Fourth Amendment privacy violation regarding the warrantless entry and seizure of the apartment.

Relying upon the since-abrogated provocation theory from *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), *abrogated by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), the district court also determined that Plaintiff's excessive force claim turned on the force Defendants used in entering the apartment and concluded that "it was clearly established as a matter of law that drawing their guns and letting themselves into the apartment violated a constitutional right to be free from excessive force." Thus, the court found that Defendants were also not entitled to qualified immunity for this claim.

The district court next granted in part and denied in part Plaintiff's motion for summary judgment. As with its qualified immunity analysis, the court found that the warrantless seizure of the apartment was a Fourth Amendment violation since there were neither exigent circumstances nor proper consent to enter. Thus, the court granted Plaintiff's motion on this issue. However, the court denied the motion as to the excessive force claim, finding that there were outstanding factual issues. In considering the facts relevant to the excessive force claim, the district court again focused on Defendants' actions relating to the warrantless entry.

Defendants appeal the district court's denial of qualified immunity for both the warrantless entry into the apartment and the use of force against Duncklee. They also appeal the district court's grant of partial summary judgment for Plaintiff as to the unreasonableness of the warrantless entry.

## II. JURISDICTION AND STANDARD OF REVIEW

Under the collateral order doctrine, this court has jurisdiction to review the district court's denial of qualified immunity under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Moreover, on an interlocutory appeal such as this one, we may exercise "[p]endent appellate jurisdiction . . . over issues that ordinarily may not be reviewed on interlocutory appeal" so long as those issues are "inextricably intertwined" with "other issues properly before the court." *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000). Because the district court's grant of partial summary judgment for Plaintiff as to the unreasonableness of the Defendants' entry into the apartment is "inextricably intertwined" with its denial of qualified immunity for that entry, we have jurisdiction to review the grant of summary judgment.

A district court's decision to grant or deny summary judgment on the ground of qualified immunity is reviewed *de novo*. *See Garcia v. Cty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007). So is a district court's decision to grant in part a party's motion for summary judgment. *White v. City of Sparks*, 500 F.3d 953, 955 (9th Cir. 2007). Viewing the facts in the light most favorable to the non-moving party, this court must determine whether there are any genuine disputes as to any material facts and whether the district court correctly applied the relevant substantive law. *See Mueller v. Auker*, 576 F.3d 979, 991 (9th Cir. 2009).

## III.   DISCUSSION

All of the district court's conclusions rest on the premise that Duncklee deserved constitutional protections because of his presence within the vacant apartment. Because Duncklee had no reasonable expectation of privacy while trespassing in the apartment, we reverse its denial of qualified immunity regarding the warrantless entry and seizure of the apartment. We also reverse the district court's denial of qualified immunity regarding the seizure of and use of force on Duncklee, as it was not clearly established that the Defendants' actions violated a constitutional right. Finally, we reverse the district court's partial grant of summary judgment in favor of Plaintiff.

### A.  Plaintiff's/Duncklee's Fourth Amendment Standing

Plaintiff obviously has standing to assert Fourth Amendment violations as to Duncklee's seizure and the use of force against him. However, Plaintiff lacks standing to assert a Fourth Amendment violation for the warrantless entry and seizure of the vacant apartment. *See Lyall v. City*

*of Los Angeles*, 807 F.3d 1178, 1186 (9th Cir. 2015) (noting that Fourth Amendment rights are personal rights that cannot be asserted vicariously and remarking that "when police trespass on property to carry out a search, a defendant has standing to raise the Fourth Amendment only if it was *his* person, house, paper, or effect searched"). Although the district court acknowledged that "because Mr. Duncklee is not alleged to have any sufficient ownership or possessory rights in the apartment, he may not have standing to challenge the search of the apartment," it nevertheless found that Duncklee could assert rights regarding the apartment.

Plaintiff recognizes that any privacy rights Duncklee had in the apartment must stem from his relationship with Watts, the former tenant who was in the apartment with him. Plaintiff describes Duncklee as an overnight guest of Watts, who Plaintiff assumes retained her rights as a tenant. If Duncklee was an overnight guest, and if Watts retained tenant rights, then Plaintiff would have standing to pursue a violation of Duncklee's Fourth Amendment privacy rights as a result of Defendants' warrantless entry into the apartment. *See Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010) ("An overnight guest in a home staying with the permission of the host has a reasonable expectation of privacy under the Fourth Amendment.").

However, Watts had no privacy rights to assign to Duncklee. *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787–88 (9th Cir. 1994) (holding that a house guest of a squatter has no greater right to be on the property than does the squatter), *superseded on other grounds as recognized by Margolis v. Ryan,* 140 F.3d 850, 854–55 (9th Cir. 1998). Although Plaintiff couches the case as being of a civil

landlord/tenant nature, the reality is that Watts was a trespasser, as she had been evicted from the property.

One who has been formally evicted has no reasonable expectation of privacy in his or her previous residence. *United States v. Struckman*, 603 F.3d 731, 747 (9th Cir. 2010) (providing that a trespasser cannot claim Fourth Amendment protections); *United States v. Young*, 573 F.3d 711, 713, 716 (9th Cir. 2009) (holding that "because the hotel did not actually evict [the defendant], he maintained a reasonable expectation of privacy in his hotel room," and explaining that "[b]eing arrested is different from being evicted, and being arrested does not automatically destroy [a] person's reasonable expectation of privacy in his home"); *United States v. Bautista*, 362 F.3d 584, 590 (9th Cir. 2004) (providing that "unless his occupancy had been lawfully terminated when the police conducted their search, [the defendant] retained a reasonable expectation of privacy in the room"); *Zimmerman*, 25 F.3d at 787 (concluding that squatters have no reasonable expectation of privacy); *Klee v. United States*, 53 F.2d 58, 59 (9th Cir. 1931) (providing that trespassers "cannot claim the benefit of the Fourth Amendment"). Even though Watts had not removed all of her personal property from the apartment, she had no reasonable expectation of privacy in the apartment on the night of May 21, 2014. Indeed, as Plaintiff acknowledged in her answering brief, Watts had been formally evicted, her key had been taken away, and she had made an appointment for several days later to re-enter the apartment to obtain her property.

Because the undisputed evidence shows that Watts was aware of her eviction, this case differs from situations where the individuals claiming privacy rights either did not know they had been evicted or claimed that they still had tenancy

rights. *See Young*, 573 F.3d at 716–17; *King v. Massarweh*, 782 F.2d 825, 826, 828 (9th Cir. 1986) (providing that individuals who had been paying rent and were claiming tenancy rights during a landlord/tenant dispute had Fourth Amendment protections in connection with a warrantless search of their apartment, the seizure of their personal property, and their warrantless arrests). In that she had been evicted and locked out, Watts had no reasonable expectation of privacy in the apartment.

Like Plaintiff, the district court appears to have erroneously viewed this case through a landlord/tenant lens. All of the cases relied upon by the court involve situations where the aggrieved individuals resided in the domiciles at issue and had reasonable expectations of privacy. For example, the district court asserted that "[t]he facts of this case are substantively indistinguishable from those in *King* and *Frunz* [*v. City of Tacoma*, 468 F.3d 1141 (9th Cir. 2006)]." Both of these cases involve warrantless searches, lack of the residents' consent to search, and their Fourth Amendment rights arising from the searches. As stated, *King* involved a landlord/tenant dispute in which the tenants had been paying rent and were claiming tenant rights. 782 F.2d at 826, 828. In *Frunz*, the plaintiff owned the home that was searched. 468 F.3d at 1142. Thus, both of these cases are distinguishable from the present case in that the plaintiffs in those two cases either had property rights or at least made claims, supported by evidence, that they had such rights.

In conclusion, the district court's analysis of this case rests on a faulty premise, as Duncklee had no reasonable expectation of privacy in the apartment on the night he was shot by Defendants. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (explaining that the aggrieved "must demonstrate that he personally has an expectation of privacy in the place

searched, and that his expectation is reasonable"). Thus, Plaintiff has no standing to assert a Fourth Amendment claim on this basis.

## B. Qualified Immunity Regarding the Seizure of the Apartment

The district court began its analysis of Defendants' qualified immunity claim regarding the seizure of the apartment by stating that "[o]fficers Meyer and Soeder did not have a warrant when they opened the door to and entered the apartment." It then explained that "'[i]t is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)). The court simply assumed that the apartment was "home" for Watts and, presumably by her permission, for Duncklee. As discussed above, under the uncontested facts of this case, this conclusion is legally untenable.

Whether qualified immunity is warranted involves a two part inquiry: (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In that Duncklee had no reasonable expectation of privacy in the apartment, Plaintiff cannot establish that Defendants violated Duncklee's Fourth Amendment rights by entering the apartment without a warrant. Thus, the first inquiry of the qualified immunity test is not satisfied and the district court's decision to deny qualified immunity regarding this claim must be reversed.

## C.  Qualified Immunity Regarding the Seizure of and Use of Force on Duncklee

The district court, in denying qualified immunity to Defendants as to the seizure of and use of force on Duncklee, relied on its previous conclusion that the warrantless entry violated Duncklee's constitutional rights and, thus, everything that occurred thereafter was part of that initial violation. Citing the provocation theory from *Alexander*, the court remarked that Plaintiff's "'excessive force claim turns on the force the officers used in entering the [apartment],'" (alteration in original) (quoting *Alexander*, 29 F.3d at 1366 n.12), and concluded that "it was clearly established as a matter of law that drawing their guns and letting themselves into the apartment violated a constitutional right to be free from excessive force."**[5]**

The provocation theory was succinctly recited in *Billington v. Smith*, which held that under *Alexander*,

> if the police committed an independent Fourth Amendment violation by using unreasonable force to enter the house, then they could be held liable for shooting [a] man – even though they reasonably shot him at the moment of the shooting – because they "used excessive force in creating the situation

---

**[5]** As stated, the district court also accepted Plaintiff's argument that the case involved "a landlord-tenant dispute, a matter governed by civil and not criminal laws." ER019. In light of Watts' formal eviction and acceptance thereof, we disagree. Under any view of the facts, the case involved a criminal trespass. *See, e.g.,* ER060 (April 25, 2014 Civil Minute Entry authorizing the order of eviction and noting that once served with the order, an individual who returns to the property without permission commits criminal trespass in the third degree).

> which caused the man to take the actions he
> did."

292 F.3d 1177, 1188 (9th Cir. 2002) (alterations omitted)
(quoting *Alexander*, 29 F.3d at 1366). However, in *County
of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), decided
after the district court's opinion in this case, the Supreme
Court abrogated *Billington* and the provocation theory. The
Supreme Court concluded that the provocation theory was
incompatible with established federal excessive force
jurisprudence and held that an earlier "Fourth Amendment
violation cannot transform a later, reasonable use of force
into an unreasonable seizure." *Id.* at 1544. The Court
recognized that the provocation theory conflated distinct
Fourth Amendment violations and held that the objective
reasonableness of each search or seizure must be analyzed
separately. *Id.* at 1547. In light of *Mendez*, the district court
erred in relying on the provocation theory.

The question before this court, then, is whether the
officers are entitled to qualified immunity as to their seizure
of and use of deadly force on Duncklee. As we have said, the
qualified immunity analysis has two prongs: (1) whether the
facts alleged by the plaintiff establish that a constitutional
right of his was violated; and (2) whether that right was
"clearly established" at the time of the alleged violation. We
may consider these two prongs in either order. *Pearson*,
555 U.S. at 234.

We shall begin with the second prong: was it "clearly
established" under the undisputed facts of this case that
Defendants should not have used deadly force on Duncklee?
These facts, as summarized in declarations made by Meyer
and Soeder, are that upon opening the bedroom door with
guns drawn, Duncklee immediately advanced towards the

officers, yelling or growling, with a two-foot length of broken hockey stick raised in a threatening manner. The apartment was small and cluttered, making it difficult for the officers to retreat. Before firing, Officer Meyer yelled "police, stop" at Duncklee.

We conclude that reasonable officers in Defendants' positions would not have known that shooting Duncklee violated a clearly established right. Indeed, the case law makes clear that the use of deadly force can be acceptable in such a situation. *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) ("[I]f the suspect threatens the officer with a weapon . . . , deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."); *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1111–13, 1117–19 (9th Cir. 2005) (holding that deputies were entitled to qualified immunity for shooting a suspect wandering around a neighborhood with a raised sword, making growling noises, and ignoring commands to drop the weapon). Thus, even assuming that a constitutional violation occurred, the district court erred by denying Defendants qualified immunity from this claim.

## IV.    CONCLUSION

The district court erred in denying qualified immunity to Defendants for their entry into the apartment and use of force on Duncklee. Moreover, because Defendants are entitled to qualified immunity on Plaintiff's claim arising out of their entry into the apartment, the district court erred by granting partial summary judgment for Plaintiff as to that claim.

**REVERSED and REMANDED.**