NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

APR 29 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ANTHONY SIMS, | No. 23-35545 |
| Plaintiff-Appellee, | D.C. No. 2:22-cv-00483-TL |
| v. | |
| ROBERT BROWN, Officer of the Seattle Police Department; et al., | MEMORANDUM* |
| Defendants-Appellants, | |
| and | |
| CITY OF SEATTLE, a municipal corporation, | |
| Defendant. | |

Appeal from the United States District Court
for the Western District of Washington
Tana Lin, District Judge, Presiding

Argued and Submitted April 5, 2024
Portland, Oregon

Before: OWENS and FRIEDLAND, Circuit Judges, and RAYES,** District Judge.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Douglas L. Rayes, United States District Judge for the District of Arizona, sitting by designation.

Defendant police officers appeal the district court's denial of qualified immunity in a case arising from a vehicle stop of Plaintiff Anthony Sims. Based on erroneous suspicion that Sims's car was stolen, at least six officers surrounded him with their guns drawn or pointed, frisked him, and opened his locked trunk. Sims filed this 42 U.S.C. § 1983 action, alleging various constitutional violations.

Because this is an interlocutory appeal, our jurisdiction is limited to resolving "whether the defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Peck v. Montoya*, 51 F.4th 877, 885 (9th Cir. 2022) (alteration in original) (quoting *George v. Morris*, 736 F.3d 829, 836 (9th Cir. 2013)). Because the district court's grant of partial summary judgment to Sims as to the trunk search is "inextricably intertwined" with its denial of qualified immunity for that search, we have jurisdiction to review the grant. *Woodward v. City of Tucson*, 870 F.3d 1154, 1159 (9th Cir. 2017) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000)); *see also Mueller v. Auker*, 576 F.3d 979, 989-91 (9th Cir. 2009) (explaining that there is "pendent appellate jurisdiction" over questions that are "inextricably intertwined" with immediately appealable questions of qualified immunity). We review a grant or denial of summary judgment on the ground of qualified immunity de novo. *Woodward*, 870 F.3d at 1159. We must determine whether the officers' conduct

(1) violated a constitutional right that (2) was clearly established at the time of the violation. *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023). We affirm in part, reverse in part, and remand.

1. To start, the district court erred in failing to conduct an individualized analysis of each officers' conduct. *See Cunningham*, 229 F.3d at 1289. Given that error, we could remand for the district court to conduct the necessary individualized analysis. Although it would have been better if the district court had done that analysis in the first instance, both parties agree that we may reach the issues ourselves and "conduct the individualized analysis that the district court failed to perform." *Id.* at 1289. We exercise our discretion to do so to avoid further delaying these proceedings.

2. Beginning with Lieutenant Robert Brown, the district court properly denied qualified immunity for all of the alleged violations and did not err in granting partial summary judgment to Sims as to the trunk search.

Crucially, given the district court's holding that there was a genuine dispute as to the reasonableness of suspecting that Sims's vehicle was stolen, we must assume in reviewing the district court's denial of summary judgment that Brown's mistake of fact was unreasonable. *See Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) ("A public official may not immediately appeal . . . whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact

for trial." (alteration and quotation marks omitted)); *Torres v City of Madera*, 648 F.3d 1119, 1125-27 (9th Cir. 2011) (holding that a jury could find that an officer's belief that she was holding her Taser instead of her gun was unreasonable). We therefore conduct our analysis of the district court's denial of summary judgment as though the only proper basis for the stop was unilluminated headlights. With that baseline, all of Brown's challenged conduct was unlawful under clearly established law.

Sims first challenges the scope of the stop, asserting that the intrusive tactics used gave rise to a de facto arrest without probable cause. "Investigative stops based upon suspicion short of probable cause are . . . constitutionally permissible only where the means utilized are the least intrusive reasonably available." *Kraus v. Pierce County*, 793 F.2d 1105, 1108 (9th Cir. 1986). The parties agree that there was not probable cause here for an arrest. Whether an investigative *Terry* stop has risen to the level of an arrest without probable cause is a "highly fact-specific inquiry that considers the intrusiveness of the methods used in light of whether these methods were 'reasonable *given the specific circumstances.*'" *Green v. City & County of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) (quoting *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996)).

After weighing the relatively intrusive tactics used here against the countervailing factors, we cannot conclude that the conduct was "reasonably

related in scope to the circumstances which justified the interference in the first place," *Terry v. Ohio*, 392 U.S. 1, 20 (1968), let alone that the "means utilized [were] the least intrusive reasonably available," *Kraus*, 793 F.2d at 1108. Sims was compliant at all times, presented no sign of being dangerous or fleeing, and was outnumbered at least six to one. Brown had no reason to believe that Sims was armed, that the stop followed a violent crime, or that a violent crime was about to occur. *See Washington*, 98 F.3d at 1185-87 (describing the relevant factors and explaining that "even markedly less intrusive police action" than drawing weapons and using handcuffs will violate the constitution where "the inherent danger of the situation does not justify the intrusive police action"). Defendants' position that any individual pulled over for a minor traffic violation could be lawfully subjected to the tactics used here is untenable. *See id.* at 1189 ("It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity." (quoting *United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988))).

At the time of the stop, it was clearly established that under these circumstances, multiple officers surrounding a vehicle with weapons drawn and issuing commands at gunpoint exceeded the scope of a proper investigative stop. *See United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974) (holding that an

5

investigatory stop became an arrest at the moment of "an armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands"); *United States v. Robertson*, 833 F.2d 777, 781 (9th Cir. 1987) (holding that an investigatory stop became an arrest "upon . . . encirclement by officers who gave her orders at gunpoint"); *United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975) (holding that investigatory stop became an arrest when "the agents at gun point, under circumstances not suggesting fears for their personal safety, ordered the [vehicle occupants] to stop and put up their hands").

Relatedly, Sims brings a separate claim of excessive force for pointing a gun at him. *See Green*, 751 F.3d at 1047-51 (analyzing unlawful arrest and excessive force separately). "[P]ointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).

At the time of the stop, it was clearly established that "pointing guns at persons who are compliant and present no danger is a constitutional violation." *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) (quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009)); *see also Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th Cir. 2009) (holding it was unconstitutional to point a gun at an individual where "[t]he crime under investigation was at most a misdemeanor[,] the suspect was apparently unarmed and approaching the officers in a peaceful way[,] [t]here

were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff" (alterations in original) (quoting *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc))). For reasons already discussed, because we resolve any disputes in Sims's favor, there was no justification for pointing a gun at him. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that any use of force must be weighed against the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is actively resisting arrest or attempting to flee); *Green*, 751 F.3d at 1049 ("Where these interests do not support a need for force, *any* force used is constitutionally unreasonable." (quotation marks omitted)).

Moving to the frisk, it was clearly established that a pat-down of a driver during a traffic stop must be justified by "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Because a frisk is "justified by the concern for the safety of the officer" as opposed to investigation of crime, "[a] lawful frisk does not always flow from a justified stop." *Thomas v. Dillard*, 818 F.3d 864, 875-76 (9th Cir. 2016). Other than suspicion of the stolen vehicle, which we must disregard for purposes of this appeal as explained above, the officers have made no attempt to point to "specific and articulable facts" that would support reasonable suspicion that Sims was armed and dangerous. *Id.* at 876. Sims did not behave nervously or

suspiciously, made no "furtive movement," and offered no other reason to think he was armed. *Cf. United States v. Garcia-Rivera*, 353 F.3d 788, 789-90, 791 (9th Cir. 2003) (holding that it was lawful to frisk a driver who leaned forward "as if reaching for something or putting something down," failed to produce vehicle documentation, and said he had been convicted of armed robbery).

Finally, we agree with the district court that the prohibition on the trunk search was clearly established under any version of the facts. Warrantless searches are presumed unreasonable "subject only to a few specifically established and well-delineated exceptions." *United States v. Ruckes*, 586 F.3d 713, 716 (9th Cir. 2009) (alteration omitted) (quoting *United States v. Caseres*, 533 F.3d 1064, 1070 (9th Cir. 2008)); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (holding that "concern for officer safety [during a routine traffic stop] . . . does not by itself justify" a vehicle search); *Arizona v. Gant*, 556 U.S. 332, 346-47 (2009) (listing permitted exceptions to the warrant requirement for vehicles).[1]

Defendants characterize the search as a protective sweep, relying on *Michigan v. Long*, 463 U.S. 1032 (1983). But *Long* extended *Terry* pat-downs only to passenger compartments and cannot reasonably be interpreted as applying

---

[1] Defendants do not argue that there was probable cause to believe the vehicle contained evidence of a crime. Thus, the search was not authorized under the "automobile exception." *See United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010).

to a locked trunk that is inaccessible from the passenger compartment. *Id.* at 1048-49; *see also Arizona*, 556 U.S. at 346 (describing *Long* as "permit[ting] an officer to search a vehicle's passenger compartment" in certain circumstances). Further, at the moment of the search, Sims was speaking with Brown a good distance from the vehicle and the officers were in possession of the keys. No reasonable officer could believe that Sims would have been able to grab a weapon from the trunk in those circumstances.

Having established that all the conduct was unlawful under sufficiently specific caselaw, we turn to Defendants' argument that Brown did not directly participate in the violative conduct. "Although there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed to act to prevent them." *Vazquez v. County of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020) (alteration in original) (quoting *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1182 (9th Cir. 2007)); *see also Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022) (explaining circumstances under which a supervisor may be held liable for the acts of his reports). Similarly, an officer whose own conduct does not rise to the level of a violation can be liable as an "integral participant" if the officer (1) "knew about and acquiesced in the constitutionally defective conduct as part of a common

9

plan with those whose conduct constituted the violation," or (2) "set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck*, 51 F.4th at 891.

Under either line of cases, Brown can be held liable for all of the asserted violations. Brown testified that he was the supervising officer on the scene and that he initiated a "high-risk" stop—a trained tactic for dealing with a suspect's potential escape or violence—knowing that numerous officers would arrive and behave as if dealing with a dangerous situation, including by drawing weapons. When Sims asked the officers why they were pointing guns at him, Brown did not direct the officers to lower their guns; rather, he explained that they needed to have their guns drawn for their safety. As to the frisk, the video belies Defendants' position that Brown did not participate: Brown in fact directed the frisk, ordering Sims to come closer so that officers could "makes sure [he had] no weapons." Finally, given that Sims yelled "excuse me" as officers opened his door to get his keys, interrupting his conversation with Brown, there can be no genuine dispute that Brown was aware of the other officers' actions with respect to the car. Yet he failed to communicate to the officers that dispatch had cleared the plates or call off any search of the car. Whether framed as setting in motion a series of acts or as

10

acquiescence, Brown's participation was sufficient for liability on all of the Fourth Amendment claims. *See Vazquez*, 949 F.3d at 1166; *Peck*, 51 F.4th at 891.

3. Turning to the Officers Richardson, Nash, and Follette, "law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers." *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc). "Where an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous." *Id.* at 1082. Here, it was reasonable as a matter of law for the officers to rely on Brown's report that he was stopping a possible stolen vehicle. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008) (concluding as a matter of law that a detective reasonably relied on an allegedly false statement of another detective). We thus assume in our analysis of the claims against the responding officer Defendants that it was reasonable of them to suspect that Sims's car was stolen.[2]

---

[2] At oral argument, Sims asserted that under *Green*, there is at least a dispute of fact as to whether it was reasonable for the responding officer Defendants to suspect the vehicle was stolen. In *Green*, however, we analyzed whether the sergeant who pulled the vehicle over could reasonably rely on another officer's unconfirmed license plate hit—without himself visually confirming the plate number and despite spending time stopped behind the suspect at a red light. 751 F.3d at 1042-43, 1045-46. The officer admitted that if he had read the full plate, he would not have had reasonable suspicion to stop the car. *Id.* at 1043. Unlike in

11

Because the officers who responded to the scene operated on reasonable suspicion that the vehicle was stolen, they are protected by qualified immunity on Sims's claim that the scope of the stop was unconstitutional. There is no clearly established law that the tactics used during this "high-risk" stop were unlawful on suspicion of a stolen vehicle. Although some of the facts in *Green* are similar to those here, there the tactics used were more intrusive: the officers handcuffed the suspect, forced her to her knees, detained her for up to twenty minutes, and *continued* to point their guns at her after she was handcuffed and secured.[3] 751 F.3d at 1041, 1050.

As to the remaining claims, starting with Officer Richardson (who opened Sims's trunk), he is not entitled to qualified immunity on the trunk search given our conclusion that the search was unlawful under clearly established law even on reasonable suspicion that the car was stolen. But because Richardson did not participate in the frisk and did not point his gun at Sims, he was not an "integral

---

*Green*, here it would not have been reasonable to expect each responding officer Defendant to independently verify the plate number. *See United States v. Hensley*, 469 U.S. 221, 231 (1985) (noting that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information" (quotation marks omitted)).

[3] Importantly, *Green* did not clearly establish whether "the existence of a stolen vehicle, in and of itself, [was] enough" to justify the tactics used, stating it was "a conclusion over which reasonable jurors could disagree." 751 F.3d at 1048.

participant" in those violations and may not be held liable for them. *See Peck*, 51 F.4th at 891.

Similarly, Officer Nash is not entitled to qualified immunity on the trunk search. As he testified and is audible in the video, Nash discussed "popping the trunk" with Richardson and then checked the vehicle identification number as Richardson opened the trunk. As such, Nash "knew about and acquiesced in the constitutionally defective conduct as part of a common plan" under the integral participant doctrine. *Id.*

Because Nash had reasonable suspicion that Sims's vehicle was stolen, however, Nash is entitled to qualified immunity for the excessive force claim for pointing his gun at Sims for lack of clearly established law. Although we are skeptical of the propriety of pointing a gun in these circumstances, there is no case that "squarely governs" whether an officer may briefly point a gun at a suspect believed to have stolen a vehicle in the context of a traffic stop on the side of the road, before the officer has confirmed that the suspect is unarmed as the suspect approaches. *See Hopson*, 71 F.4th at 698, 704-05; *Hopkins*, 573 F.3d at 777 (reasoning that a gunpoint was unconstitutional in part because officer was investigating a misdemeanor); *Robinson*, 278 F.3d at 1014 (same); *Thompson*, 885 F.3d at 586-87 (holding a gunpoint was unlawful in a felony stop where the officers had already confirmed the suspect was unarmed).

13

And like Officer Richardson, Nash did not participate in the frisk and was thus not an integral participant in that violation. *See Peck*, 51 F.4th at 891.

Finally, Officer Follette is entitled to qualified immunity for all of the asserted violations given his limited participation at the scene. Follette simply arrived, momentarily took cover behind a patrol car with his gun unholstered, and walked around Sims's car after checking its vehicle identification number through the windshield. Follette did not point his gun at Sims, participate in the frisk, or plan or execute the trunk search. Follette was thus not an integral participant in any of the violative conduct. *See id.* at 889 (noting that "simply being present at the scene does not demonstrate that an officer has acted as part of a common plan").

In sum, we hold as follows on the Fourth Amendment claims: (1) Brown is not entitled to qualified immunity for any of the asserted violations; (2) Richardson is not entitled to qualified immunity for the trunk search, but he is entitled to qualified immunity for the remaining asserted violations; (3) Nash is not entitled to qualified immunity for the trunk search, but he is entitled to qualified immunity for the remaining asserted violations; (4) Follette is entitled to qualified immunity for all asserted violations. And we hold that as to Brown, Richardson, and Nash, the district court did not err in granting partial summary judgment to Sims.

4. Regarding Sims's equal protection claim for race discrimination, we do not have jurisdiction to review the district court's determination that there was a genuine dispute of fact as to whether race was a motivating factor for Brown's decision to escalate tactics during the stop. *See Est. of Anderson*, 985 F.3d at 731; *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019) ("Our limited jurisdiction over the officers' appeal from the denial of qualified immunity severely restricts our review of [plaintiff's] equal protection claim. . . . What we may think of the sufficiency of the statistics to show discriminatory effect is no matter for this appeal."). This is not a case where Sims relied on pure conclusory allegations of bad motive, contrary to Brown's assertion. *Cf. Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001).

Nor did the district court err in failing to require a comparator—Sims's claim is based on Brown's escalation of tactics, not selective enforcement. *See Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948-49 (9th Cir. 2003) (noting that to avoid summary judgment on an equal protection claim, a plaintiff must "produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was racially motivated" (alterations in original) (quotation marks omitted)), *overruled on other grounds by Edgerly v. City & County of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010).

But, again, the district court failed to conduct an individualized analysis of each officer's conduct in evaluating whether the officers were entitled to qualified immunity on this claim. *See Cunningham*, 229 F.3d at 1289; *Bey*, 946 F.3d at 321 ("The district court grouped [the officers] when discussing [plaintiff's] equal protection claim. That was legal error."). Sims's equal protection claim is based on *Brown's* decision to proceed with a high-risk stop and escalate tactics— accordingly, all of Sims's evidence regarding a race-based motivation at summary judgment concerned only Brown. Because there is *no* evidence in this record that would raise a genuine dispute as to the motive of Officers Richardson, Nash, and Follette, we hold that they are entitled to qualified immunity on this claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**